William T. Sack, appellant, v. Floyd Siekman et al., appellees.

23 N. W. 2d 706.

Filed June 28, 1946. No. 32098.

*A. L. Tidd,* for appellant.

*R. A. Boehmer* and *R. S. Mockett,* for appellees.

Heard before Simmons, C. J., Paine, Carter, Messmore, Yeager, Chappell, and Wenke, JJ.

Simmons, C. J.

In this action plaintiff sought a decree in equity quieting title to real and personal property in him. The action is based on an alleged contract between plaintiff and his then wife, made pending an appeal of a divorce decree. The trial court held that plaintiff had not met the burden of proof, and made certain other findings. Plaintiff on appeal assigns, among other assignments, that the trial court erred in holding that the agreement on which the action was based was not signed by Agnes Sack, plaintiff's former wife. We examine the record as to this assignment and affirm the judgment of the trial court.

The plaintiff in this action is the divorced husband of Agnes Sack or Sacks. Following the divorce she resumed her maiden name of Agnes Ketelhut. The answering defendants are Mabel Siekman, Marie F. Sheredan, and Margaret Porter, beneficiaries under the will of Agnes (Sack) Ketelhut, and Floyd Siekman, executor of the will.

Plaintiff and Agnes Ketelhut were married September 1, 1897, plaintiff's name appearing in the certificate as Sack. On July 5, 1927, Agnes Sacks filed a petition in the district court for Cass County praying for a divorce from William T. Sacks. The action was contested. On March 24, 1928, a divorce decree was entered granting a divorce to Mrs.

Sacks and giving her a judgment for permanent alimony in the amount of $7,500, plus $500 attorneys' fees and costs, and restoring her maiden name.

Plaintiff made several efforts to be relieved of the burdens of this decree. On July 18, 1928, he filed a motion to vacate, modify, and set aside the judgment. A member of the Lincoln Bar signed as his attorney. By papers dated September 15, 1928, he sought a modification of this decree, two members of the Lincoln Bar signing as his attorneys, one being the same attorney who had signed the July papers. Plaintiff appealed from the decree and judgment, and filed his transcript in this court on September 18, 1928. On November 23, 1928, execution was issued on the judgment and levy made upon real estate. On December 21, 1928, this court issued its mandate affirming the judgment for want of briefs.

On January 2, 1929, plaintiff filed objections to the confirmation of the sale of his lands under the execution of November 23, 1928. The same two members of the Lincoln Bar signed as his attorneys. Among other reasons given was that the divorce action was pending on appeal in this court when the execution was issued. On January 14, 1929, the trial court confirmed the sale.

On October 22, 1942, Agnes Ketelhut executed her will. She died May 28, 1944. Petition to probate that will was filed in the county court of Cass County on June 12, 1944. It was admitted to probate on August 2, 1944. An appeal was taken and dismissed with prejudice on September 10, 1945.

On July 5, 1944, plaintiff filed a petition in the county court of Cass County praying for the probate of an instrument dated November 21, 1942. This instrument in longhand provided: "I will to Wm-T-Sack my real estate" describing it and naming certain others beneficiaries for small amounts. It bears a signature of one witness and is without an attestation clause. An heir at law of Agnes Ketelhut and the beneficiaries named in the October 22,

1942, will opposed the probate of the November 21, 1942, instrument. The court excluded it from evidence and plaintiff's petition for probate was dismissed. No appeal was taken.

On February 17, 1945, plaintiff filed notice in the estate matter that he had filed suit in the district court to recover all the assets left at her death by Agnes Ketelhut based upon a contract there set out, to which reference presently will be made.

In this action plaintiff alleged that on September 25, 1928, the divorce suit was pending in this court on appeal to reverse or modify the judgment for alimony, and that on that date he and his then wife, Agnes Sack, entered into an agreement as follows:

"Lincoln, Nebraska
September 25, 1928.

### AGREEMENT OF CONTRACT

This agreement made this 25th day of September, 1928, between Agnes Sack, plaintiff, of Eagle, Cass County, Nebraska, of the First Part, and Wm. T. Sack, Defendant of the same place, of the Second Part.

Witnesseth as follows: The First Party hereby agrees at her death, after her debts are paid, give all her property to the Second Party. If the First Party doesn't get married again, and the Second Party to stop case in Supreme Court, the Second Party agrees to stop and drop, and not try the divorce case in Supreme Court, and let the First Party have divorce, the First Party keep one-half furniture, until Second Party called for his one-half.

The First Party sets out to legal heirs, her brothers and sisters each $5.00.

| | |
|---|---|
| Hattie Knadle | Rynard Ketelhut |
| Frances Stange | Henry Ketelhut |
| Martha Franke | Otto Ketlehut |
| Kate Oberle | Albert Ketelhut |
| Myrtle Blanchard | Will Ketelhut. |

Witness our hands this, the 25th day of September, 1928.

Agnes Sack

Wm T Sack

R. H. Hagelin"

Plaintiff further alleged that Agnes Sack did not remarry, and was now deceased; that he had fully performed his part of the agreement; that Agnes Sack as Agnes Ketelhut tried to make a will on November 21, 1942, but the instrument failed because not properly executed; that the defendants Siekman, and the defendants Porter and Sheredan procured the execution of the October 22, 1942, will by undue influence and that an appeal from its probate was then pending; that heirs at law opposed the probate; that the defendants are in possession of the property; that he was entitled to have the contract of September 25, 1928, adjudged to be a valid contract; that he was entitled to the real and personal property of the estate save for the sums mentioned in the contract; that he was entitled to an order vesting the title to the real estate in him and commanding the defendants to turn the personal property to him.

He prayed judgment that the title of the real estate of which Agnes Ketelhut died seized be vested and quieted in him, and that the defendants be required to turn the personal property to him, and for equitable relief.

Defendants, Mabel Siekman and Marie F. Sheredan answered, denied generally, set up defenses going to the validity and enforceability of the purported contract which need not be set out here, and pleaded estoppel. The defendant, Floyd Siekman, as executor, denied generally, set up similar defenses, and pleaded estoppel. The defendant Porter denied generally and set up similar defenses. Replies were filed. Trial was had.

The trial court found that plaintiff had not met the burden of proof required to sustain his cause of action and found generally for the defendants. The court further found as a matter of law that the purported contract was

without valid consideration, an attempt to make a testamentary disposition of property, and invalid as such, and that plaintiff was estopped to maintain the action. Plaintiff's petition was dismissed. Motion for a new trial was filed and denied. Plaintiff appeals.

His first assignment of error is that the court erred in holding that the agreement of September 25, 1928, was not signed by Agnes Sack. We have heretofore set out the evidence as to general matters. We now set out the evidence dealing with the question of the proof of the signature of Agnes Sack to the instrument in question, and weigh it in the light of the rule that "Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence." Teresi v. Filley, 146 Neb. 797, 21 N. W. 2d 699.

This instrument is a carbon duplicate on yellow paper such as is commonly used in offices for a copy sheet. Except for the signatures, it is typewritten. It is clear from an examination that a strip of paper along the bottom of the sheet has been cut off.

Plaintiff testified that he was familiar with the signature of Agnes Sack. For the purpose of qualifying himself to testify as to the signature of Agnes Sack, plaintiff offered five interest coupon notes, dated February 14, 1925, and four dated September 22, 1925, and testified that he saw Agnes Sack sign the notes. He then offered the petition in the divorce case and testified that the signature thereon was that of Agnes Sacks. He testified that Sack was the correct name. He then offered an affidavit attached to the motion for temporary alimony bearing the signature "Agnes Sacks." He next offered his answer and cross-petition, and the answer to the cross-petition bearing the signature "Agnes Sacks." He then offered another affidavit in the divorce proceedings bearing the signature "Agnes Sacks."

He then was handed the purported contract upon which

his action is based. He was asked whose signature in his opinion appeared first on the paper. He answered: "Agnes Sack." He identified the next signature as "Mine." He then was asked whose signature appeared "Over at the left." The court sustained an objection to the question. He then testified that he was acquainted with R. H. Hagelin and that he is dead. He gave no further testimony as to the signatures on the instrument in question.

He next was asked if he was familiar with the signature of Agnes Ketelhut and answered, "Yes." He was handed the purported will of November 21, 1942, and was asked if he had an opinion as to whose signature was attached to it. Over objections he answered, "Agnes Ketelhut's." The entire instrument was then offered in evidence for the purpose of showing that Agnes Ketelhut signed an instrument that was admitted in county court as her last will and testament and subsequent thereto signed the instrument dated November 21, 1942. The court admitted it only for the purpose of comparison of signatures. A question as to handwriting in the instrument other than the signature was asked and not answered. Later the court admitted this instrument in evidence "for what it is worth for consideration in the case as a whole."

Plaintiff then produced the testimony of his brother who was not permitted to answer as to his opinion concerning whose signature appeared on the purported contract.

He next produced the testimony of one R. A. Yabsley, who testified that he was acquainted with Mr. and Mrs. Sack. He was asked if he was in the office of Mr. Hagelin on September 25, 1928, and remembered "being in an office sometime but as to the dates I couldn't exactly say." He then was asked to "look at" the purported contract and without further questioning said "that there reads a good deal the same." In answer to a question as to who else was in the office, he stated that Mrs. Sack, another lady, and Mr. Hagelin were there when he and Mr. Sack came in; that Mr. Hagelin read an instrument to them; that Mrs. Sack

signed the instrument in question or one "similar to" it; and that he saw Mr. Sack sign it and Mr. Hagelin sign it. On cross-examination he testified that to the best of his knowledge he now recognized those signatures; that he was not asked to sign as a witness; and that he just met Mr. Hagelin that day. He then was asked how he happened to be there and answered: "I kind of got in there in a peculiar way." He said he was in Lincoln to get some auto repairs, walked down the street, met Mr. Sack who asked what he (Yabsley) was doing here. He told him. Mr. Sack asked him what he needed and he said "some pistons." Mr. Sack said: "Let me sell you a car" and "I ain't got time to talk to you now, I am supposed to be up here to the office right now, * * * Come and go along with me." Mr. Yabsley said "that is the way I got into this." Mr. Sack did not tell him what he wanted him to do. He refused to testify positively that the instrument offered was the same as that which he saw in 1928, but it read something like that and it was "One like that, or that." There were two papers signed.

Plaintiff produced as a witness a sister of Agnes Sack, who testified that she was familiar with her sister's signature and had seen her write her name many times, and that she had an opinion as to her handwriting. She was shown the instrument in question and was asked if she had an opinion as to who signed the first signature on it. She answered: "I wouldn't say yes"; "I wouldn't say that that is her handwriting"; and finally, "I am sure that isn't her handwriting." She stated that she thought she would be able to recognize her sister's signature if she saw it, and that the signature on the divorce petition was that of her sister. She was not cross-examined.

The purported contract then was admitted in evidence over objection, the court saying: "Of course, the court feels this way: That even on the objection the court might admit it in evidence and after its admission in evidence it would be for the court to determine as a question of fact its weight and sufficiency. It appears to the court that the foundational

evidence and the evidence so far adduced is rather of a weak character. The court might conclude from a comparison of the handwriting on the pleadings that have been introduced here and on the purported contract, that they were the same, yet from the oral testimony here, as counsel for the defendants point out, is of rather a weak character. I will admit it with that qualification."

When the plaintiff had rested, the defendants moved to dismiss on the ground, among others, that the contract had not been established. The court overruled the motion, remarking that the evidence "is not of very high probative value."

The defendants offered in evidence six checks dated between June 29, 1928, and December 22, 1928. The plaintiff admitted that the signatures thereon were those of Agnes Sack.

The executor testified that he had never heard of this purported contract until about the time of the hearing in county court; that prior to her death, he had been friendly with Agnes Ketelhut and she had never mentioned it to him; and that he had searched her papers and had not found a copy of it, nor seen a copy of it.

Mr. R. S. Mockett of the Lincoln Bar testified that he had represented Mrs. Sack or Ketelhut for 20 or 25 years; that he represented her throughout the divorce proceedings and in the execution and sale of the property to collect the alimony judgment; and that she consulted him repeatedly then and thereafter about other matters. He drafted her will and was a witness to its execution. He testified that she never mentioned this purported contract to him.

The trial court had the advantage of hearing the witnesses testify and of observing their demeanor on the witness stand.

There are a number of circumstances in this record that would cause triers of fact to pause and ponder. There are the "peculiar" circumstances under which the witness Yabsley became an onlooker to the signing of this instru-

ment by the two parties and the witness. The woman who was present at the signing, if it occurred, was not produced, identified, or her absence explained. Likewise, the witness to the signature on the purported will of November 21, 1942, was not produced, and his absence was not explained.

The divorce litigation was conducted in the name of Sacks, both parties so signing. With the exception of the interest coupon notes, Mrs. Sacks so signed all the papers in evidence; yet the purported agreement is drawn in the name of Sack. Both before and after this alleged contract was executed, both parties had attorneys who were representing them in the litigation. Mr. Hagelin was not of counsel, nor does it appear that he ever represented either of the parties in any matter. It seems that one or both of the parties would have gone to counsel then representing them for the making of an agreement settling the question of the alimony judgment. Neither party made any reference to this alleged contract in the litigation that followed its time of execution. Both remained completely silent about it thereafter. Plaintiff made no reference to it until after the will had been admitted to probate and the purported will rejected.

Both parties offered signatures of Agnes Sack or Sacks for the court's examination and comparison in arriving at a conclusion as to the genuineness of the disputed signature. Neither party offered the court the benefit of the advice of expert witnesses. As the triers of fact here, we have undertaken to make that comparison, our eyes aided by a magnifying glass, and our reasoning aided by an available authority, Questioned Documents, Second Edition, by Albert S. Osborn, and The Problem of Proof by the same author.

Mr. Osborn in his book, Questioned Documents, states certain guiding principles to be observed in disputed document cases: In the preliminary examination of signatures " * * * it is necessary to determine whether the writing in question shows the absence of divergent writing characteristics and the presence of the genuine writing habits and characteris-

tics of the alleged writer to a sufficient extent to warrant the conclusion that the writing is genuine; or whether the absence of a sufficient number of characteristics of genuineness and the presence of divergent characteristics lead to the conclusion that the writing is not genuine." P. 13. "The qualities and characteristics of any handwriting as determined and classified in a thorough examination, are, (1) permanent or fixed, (2) usual or common, (3) occasional and, (4) exceptional or accidental. It therefore follows that a handwriting has a certain field of possible and expected variation and without a sufficient quantity of standard writing significant habits cannot be determined, and the value and force of characteristics cannot be definitely known." P. 37. "The fundamental and usual defect in a forgery is, however, not divergence in form, but a quality of line * * *." P. 274. "The most perfect forgery is the simulated imitation in which not only the form but the manner of writing is closely imitated. When this result is the product of a high order of skill it may be difficult for anyone, by any process, to distinguish a single forged signature from one that is genuine. * * * A traced forgery, as the name implies, is the result of an attempt to transfer to a fraudulent document an exact facsimile of a genuine writing by some tracing process. The principal reason why a forged writing of this kind is usually a poor piece of work and of the various classes of forgery the easiest to dectect, is that it is not writing but slow drawing." P. 326. "Strange as it may seem, however, in many important cases the model for a traced signature is actually put in the case by the claimant in order to prove the forged writing to be genuine. The reason for this surprising action seems to be the thought that a genuine writing so like the disputed signature will undoubtedly prove the disputed signature to be genuine." P. 328. "A traced forgery will probably be defective in one or more of the following named particulars: (1) Natural movement, freedom and speed of writing; (2) quality of line or stroke; (3) pen-lifts, retouching and shading; (4) selection and

date of model writing; (5) pencil or carbon outlines or indentations pointing to a tracing process; (6) practical identity of the writing with a genuine model or close, suspicious similarity of two or more disputed signatures and in some cases signatures in exactly the same position on a printed form. * * * A brief examination of the tracing process will show that it is impossible by this method to produce a writing with a natural writing movement. If an accurate reproduction of a writing could thus be executed no one could detect it as not genuine because practically it would be the writing imitated. As has already been pointed out, however, a successful forgery must reproduce not only the form—which is the only imitation usually attempted— but also in some reasonable degree must follow the style of movement employed, the speed, pen position, quality of pen pressure, and other characteristic habits of the writer whose writing is being imitated. On some of these vital points the traced forgery is almost certain to fail; in short, natural, free, unconscious writing cannot be produced by the tracing process." P. 329. "The tracing process, necessarily giving attention as it does almost exclusively to the form, not only often shows conspicuous hesitation and tremulousness in the finer lines and at the wrong places, but often entirely omits characteristic shadings which are afterwards carefully added. Pen-lifts may be covered up, wavering lines delicately strengthened, gaps filled in, unimportant strokes extended and sometimes spliced on, and even flourishes sometimes are carefully added to a signature which, as first written, may perhaps have been good enough to pass ordinary observers as genuine if the unwise attempt had not been made to perfect it." P. 331. "The important principle to keep in mind is that the more unnecessary, delicate and hidden it is, the more significant, retouching becomes as pointing toward lack of genuineness." P. 333. "Suspicious pen-lifts, disconnections, and careful joinings should always be looked for in a writing that may have been produced by either the simulating or tracing method. The necessity of

looking at the copy in a simulated writing, or of clearly seeing the dim outline in a traced forgery, may make it necessary to lift the pen and this may be done at any place and not where the pen would naturally be raised." P. 335.

In his The Problem of Proof, the author states: "A disputed signature should also be photographed in natural size with all the standard signatures nearest in date arranged with it in order of dates. It is surprising how the common characteristics of a series of signatures are brought out by placing them close together in a vertical column. It is not usually necessary to enlarge all these signatures, although in some cases it is advisable to enlarge all the standard signatures. In most cases it is only necessary to enlarge a number of the standard signatures nearest in date to the disputed signature. Justified criticism will be avoided when standards for enlargement are selected with absolute fairness and when the disputed signature and the standards are enlarged on exactly the same scale.

"For the effective illustration of suspicious line quality, retouching, or minute changes, and other delicate characteristics, an enlargement of the disputed signature, and a few representative genuine signatures, to a considerable degree, in some special cases as much as from five to ten diameters, may be desireable." P. 358.

For convenience in discussion we have had some of the signatures photographed and reproduce them here.

PLATE I

Signatures 1, 2 and 3 on Plate 1 are taken from three of the interest coupon notes. Signature 4 is that on the divorce petition which was positively identified as genuine by plaintiff's witness. Signature 5 is the disputed signature. Signature 6 is the admitted signature on a check, written by pencil, dated September 8, 1928. Certain characteristics appear in the proved or admitted signatures—the flourish at the beginning of the capital "A", the straight up stroke and down stroke on the staffs and the flourish making the horizontal line of the "A", the separation or lifting of the pen or pencil between the "g" and the "n" in "Agnes" and the hook in the "c" in "Sacks."

An examination of the nine signatures "Agnes Sack"on the interest coupon notes shows without exception that some part or parts of them have been retouched or written over by a different pen point and in different colored ink. Signatures 1, 2, and 3 on Plate 1 show those retouchings and overwritings.

430

PLATE 2

Reference now is made to Plate 2. Figure 1 is an enlarged "A" taken from the disputed signature. Figures 2, 3, 4, 5, 6, and 7 are enlarged "A's" taken from the signatures on the checks. They may be compared with the "A" on the proved signature 4, Plate 1. The proved signatures show the upstroke, the down stroke, and the flourish all as a continuous movement. The disputed signature shows a tremulous flourish and upstroke in the first movement, the lifting of the pen, a tremulous down stroke for half the distance, then the beginning of a tremulous upstroke from the base of the right staff following through into the flourish. This goes not only to the movement but to the quality of the line which Mr. Osborn states is the fundamental and usual defect in a forgery.

Figure 8, Plate 2, is an enlargement of the "Ag" from Signature 1, Plate 1. Figure 9 is the "Ag" from the disputed signature. They suggest a copying or tracing using that part of the signature as a model.

Figure 10, Plate 2, is the "nes" taken from Signature 2, Plate 1. The overwriting and retouching are quite apparent. The "e", smaller in comparison with the "s", also is to be noted. It is more noticeable in this signature than in the others. Figure 11, Plate 2, is the "nes" from the disputed signature. The similarity in the form or pattern again is apparent, including the smaller "e". The tremulousness of the line is noted. They again suggest a copying or tracing using that part of the signature as a model.

Figure 12, Plate 2, is the "ck" from Signature 2, Plate 1. Figure 13, Plate 2, is the "ck" of the disputed signature.

The hook in the "c" appears to be retouched, as does the "k". But most noticeably the "c" in Figure 13 appears to have been written as a loop movement and then a dot placed within to simulate the hook in the "c" that is present in the. proved or admitted signatures. These again suggest a copying or tracing using that part of the signature as a model.

Referring again to the disputed Signature 5, Plate 1, the above illustrations show the hesitations, the tremulousness in the lines, and the strokes changing direction of movement, and lines spliced on—all indicative of forged signatures.

We now go to the signature to the purported will of November 21, 1942. It is reproduced in Plate 3. If genuine, it was written 14 years after the disputed signature. We note the straight horizontal line across the two staffs of the "A". It appears nowhere in the other signatures. The flourish at the base of the left staff appears to have been spliced on and placed there as a separate movement. As in the disputed signature, the "e" is much smaller than the "s" in "Agnes."

PLATE 4

Figure 1, Plate 4, is a reproduction of the Hagelin signature. In Figures 2, 3, and 4, parts of it are enlarged. If genuine, it is a free movement signature. We note the tremulous, drawn appearance of the "R". Reference next is made to the two "H's". In Figure 2 appear the tremulous up and down stroke in the first staff of the first "H" and at the base the hook upward to the left, which appears to be a

separate movement, as is likewise the line leading upward and to the right from the top of the second staff. These lines appear to have been spliced on. The first staff of the second "H" shows a heavier spot and a break on the right side of the loop. This shows on the original as a dot indicating a pause and a lifting of the pen at that point, and the starting of a new movement.

Figure 3, Plate 4, is the enlarged "g". It need hardly be mentioned that this shows a drawing and a retouching. The heavy lines in comparison with the lines before and after are noted.

Figure 4, Plate 4, is the "in" from the signature. We note the break in the swing of the down line of the "i" and the heavy shading indicating that the line was broken and retraced at that point. There is also the reshading in the first movement of the "n", more apparent in the original than in the copy produced here.

In the above reproductions of the Hagelin signature, there are found the hesitations, the tremulousness in the lines, the strokes changing direction of movement, and lines spliced on—all indicative of a forged signature.

We need not further discuss the signatures. We need also go no further here than to conclude, as did the trial court, that the plaintiff has not met the burden of proof required to sustain his cause and specifically has not proved that the alleged agreement was signed by Agnes Sack, his former wife.

The other assignments of error need not be considered.

The judgment of the trial court is affirmed.

AFFIRMED.