IN RE ESTATE OF JEAN F. MCCARTNEY, DECEASED.
KIRK MCCARTNEY, PERSONAL REPRESENTATIVE OF THE
ESTATE OF JEAN F. MCCARTNEY, DECEASED,
APPELLANT, V. SHIRLI FRANK MCCARTNEY, APPELLEE.

330 N.W.2d 723

Filed February 25, 1983. No. 81-779.

Ray C. Simmons of Ray C. Simmons, P.C., for appellant.

Levy & Lazer, for appellee.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, WHITE, HASTINGS, and CAPORALE, JJ., and MORAN, D.J.

BOSLAUGH, J.

Jean F. McCartney died testate on June 1, 1980, a resident of Dodge County, Nebraska. His will, dated June 3, 1977, which devised his entire estate to his

children, Kirk McCartney and Susan Frye, was admitted to probate on August 15, 1980.

On October 10, 1980, Shirli Frank McCartney filed a petition for formal determination of heirship in the county court. The petition alleged that she was married to the deceased at the time of his death and entitled to a statutory share of his estate as an omitted spouse.

Both the petitioner and the deceased had been previously married and divorced. The deceased and his first wife, Lois, were divorced on April 6, 1977. The petitioner claims her marriage to the deceased took place in December 1977.

The county court found that the petitioner, Shirli Frank McCartney, had failed to prove a valid marriage. Upon appeal to the District Court that court found that a marriage had been shown and the personal representative had failed to prove that it was invalid. The personal representative has appealed to this court.

The issue presented by the appeal is whether the petitioner and the deceased were married at the time of his death. Marriage is a fact which may be proved by direct or circumstantial evidence, or by documentary or parol evidence. The weight and sufficiency of the evidence to prove marriage is governed by the general rules of evidence. *Bourelle v. Soo-Crete, Inc.,* 165 Neb. 731, 87 N.W.2d 371 (1958).

The general rule is that the burden of proof of marriage is upon the party who pleads it. *Morris v. Equitable Life Assurance Society,* 109 Neb. 348, 191 N.W. 190 (1922). The rule is stated in 52 Am. Jur. 2d *Marriage* § 129 (1970) as follows: "While the distinction is not always clear in many cases, the question of burden of proof in marriage law depends on whether the issue is seen as the existence of a disputed marriage—that is, whether there was ever a genuine attempt to form a marital union—or as the validity of a marriage shown or conceded to have come into existence. Where the issue is whether a

marriage was ever contracted, the view generally taken is that the burden of proof is on the party asserting its existence, especially if the claim is for a common-law marriage.

"On the other hand, where the issue is whether a marriage shown to exist is valid, the general rule is that the person attacking its validity has the burden of proving invalidity. This rule applies to common-law as well as to ceremonial marriages." Under the circumstances in this case the burden of proof was on the petitioner to prove the marriage.

The personal representative urges that the review in this court is de novo. Prior to the repeal of Neb. Rev. Stat. § 30-1606 (Reissue 1979), appeals of this nature were determined de novo in this court. Section 30-1606 was repealed effective August 30, 1981. See Neb. Rev. Stat. § 30-1601 (Cum. Supp. 1982). The review in the District Court is now for "error appearing on the record." Neb. Rev. Stat. § 24-541.06 (Cum. Supp. 1982).

The case was tried in the District Court on July 13, 1981, and decided September 22, 1981. We have concluded that we need not determine which standard of review is applicable to this case because we reach the same result under either standard.

At the hearing in the county court the petitioner testified that she and Jean F. McCartney were married in a civil ceremony somewhere in Arkansas on December 27, 1977. She testified that she and Jean had left the Omaha area on that date in his car. She was feeling very sleepy and slept during most of the long ride. She testified that they stopped and parked in front of a private residence and she noticed a car that had rolled down an embankment. Before getting out of the car Jean asked her to marry him. They went up to a house and were admitted by an older man. An older woman was also present. A ceremony consisting only of the marriage vows was then performed by the man. Following the ceremony Shirli and Jean signed a "cer-

tificate of marriage," but the document was folded by Jean so that she could see very little of it. They got back in the car and returned to Omaha. Shirli testified that she and Jean had discussed marriage on several occasions, but she did not know in advance that the wedding was to take place.

Shirli's testimony concerning the details of the marriage was extremely vague. Her testimony in an earlier deposition, although somewhat similar, differed in regard to several important details from that given at the hearing.

At the time of the deposition she did not know where the ceremony had taken place. Before the hearing in the county court she consulted a psychiatrist and submitted to hypnosis. She claims that as a result of the hypnotic sessions she was able to recall that the ceremony took place in Arkansas. There is some evidence that Shirli had previously named other states as being the one in which the marriage was performed.

The requirements for a valid marriage in Arkansas are similar to those in Nebraska. Common-law marriages are not recognized and only ceremonial marriages are valid. *Furth v. Furth,* 97 Ark. 272, 133 S.W. 1037 (1911); *Spicer v. Spicer,* 239 Ark. 1013, 397 S.W.2d 129 (1965). There are statutory requirements for a license and blood tests before a marriage may be solemnized. Ark. Stat. Ann. §§ 55-201 et seq. (Repl. 1971).

All arrangements for the wedding had been made by Jean. Shirli had not taken a blood test specifically for the ceremony. She saw the marriage certificate only once after the ceremony and never saw it folded out to its full length. According to Shirli, Jean said that he wanted to keep the location of their marriage a secret so that she would not be able to divorce him.

After their return to Nebraska they did not live together for about 8 months. Shirli continued to live in Omaha while Jean resided at his "ranch" in

Fremont. Shirli testified that she continued to live in Omaha because her son was to graduate from high school and she did not want him to change schools. Shirli and her children moved to Fremont in August 1978.

They told no one of the marriage until February 1978. At that time they told some of their children and some of their friends. Thereafter, Jean McCartney introduced Shirli as his wife to friends and business acquaintances. He told a few of his friends that he and Shirli had been married in Arkansas.

Jean filed his 1978 income tax return as married, filing separately. Jean designated Shirli McCartney, his wife, as the beneficiary for his accumulated sick leave. He changed his life insurance policy beneficiaries to Shirli McCartney, his wife. He listed Shirli as his wife on his medical records and named her as joint tenant on his bank records. Jean McCartney's name appeared on the school records of Shirli's children.

The record shows that after February 1978 the deceased and the petitioner conducted their lives as if they were married. However, evidence that would be sufficient to establish a common-law marriage is not sufficient to establish a marriage under our present law. In *Ropken v. Ropken,* 169 Neb. 352, 354, 99 N.W.2d 480, 483 (1959), this court stated: "Common-law marriages are not recognized in Nebraska by legislative enactment. . . . Cohabitation in Nebraska without a ceremonial marriage is meretricious. It is not evidence of a marital status in this state." In order to prove a marriage the petitioner was required to establish that a ceremonial marriage had taken place.

There is no evidence of a ceremonial marriage except the testimony of the petitioner. Her description of the wedding and what took place on the hurried trip to Arkansas is so vague and indefinite that it is inherently improbable. She remembers

almost no details of the trip, claiming that she was asleep most of the time.

It does not seem reasonably likely that a mature woman would forget the most important details (i.e., time, date, and place) of her wedding ceremony. Nor does it seem likely that anyone not affected by drugs, alcohol, or severe illness could travel that great a distance without remembering many details of the trip or its ultimate destination. See *Taylor v. Taylor,* 230 S.E.2d 924 (W. Va. 1976), in which plaintiff's proof of a marriage ceremony was held to be so incredible that it precluded a finding that a ceremony had taken place.

The lack of any documentary corroboration of her testimony concerning the ceremony is significant. No one has been able to discover any official record of the marriage. Although she claims that she saw the marriage certificate on one occasion in Nebraska, it was not found among the papers and personal effects of the deceased, and was not produced at the hearing.

The hypnotic sessions and the testimony of the psychiatrist cast doubt on her testimony. The psychiatrist called by the petitioner testified that Shirli was "highly influenceable in emotional situations"; that she suffered from a hysterical neurosis characterized by disassociative and conversion phenomenon with amnesia and loss of memory when emotionally stressed; that she tended to go into trances spontaneously; and that she was "highly suggestible and influenceable." On cross-examination this witness admitted that it was possible that Shirli had imagined that the marriage ceremony had taken place.

Although some witnesses testified that the deceased had told them that he and the petitioner had been married in Arkansas, there was other testimony that the deceased had said that he had not married Shirli and would not marry her. Jack McCartney, a brother of the deceased, testified that on

two occasions, once before the alleged date of the marriage and again after that date, the deceased told him he had not married Shirli and did not intend to marry her. Further, there was evidence that the deceased was sometimes untruthful.

The petitioner relies heavily on *Allen v. Allen,* 121 Neb. 635, 237 N.W. 662 (1931), in which this court found upon disputed facts there had been a valid marriage. There are significant differences between the cases.

In the *Allen* case the plaintiff's evidence established that the ceremony had been performed by a Reverend Wilson, an Adventist minister, on September 28, 1923, at Denver, Colorado, where both parties resided. The plaintiff in the *Allen* case had received a certificate of marriage from the officiating clergyman.

The trier of fact was not required to accept the testimony of the petitioner that a ceremonial marriage was performed someplace in Arkansas on December 27, 1977. Uncontroverted testimony need not be accepted as absolute verity, especially when that testimony is opposed to common knowledge or human experience, or is inherently improbable, unreasonable, or unworthy of belief. *Baliulis v. Campbell Soup Company,* 204 Neb. 739, 285 N.W.2d 227 (1979); *Marston v. Drobny,* 166 Neb. 747, 90 N.W.2d 408 (1958); *Sack v. Siekman,* 147 Neb. 416, 23 N.W.2d 706 (1946). The trier of fact has a right to test the credibility of a witness by his self-interest and to weigh undisputed testimony against facts and circumstances in evidence from which a conclusion can be drawn that the testimony is not true. *Riley v. City of Lincoln,* 204 Neb. 386, 282 N.W.2d 586 (1979).

While a rebuttable presumption of a valid marriage may arise upon proof of a ceremonial marriage, we do not reach that question in this case. As we view the record, and as the county court found, the petitioner failed to establish by a preponderance of the evidence that a ceremonial marriage took place.

The judgment of the District Court is reversed and the cause remanded for further proceedings in conformity with this opinion.

REVERSED AND REMANDED.